UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

BOQUET OYSTER HOUSE, INC.,                    CIVIL ACTION
ET AL.

VERSUS                                        NO: 09-3537

UNITED STATES OF AMERICA, ET                  SECTION: "A" (2)
AL.

### ORDER AND REASONS

Before the Court are a **Cross-Motion for Summary Judgment by Motivatit Seafood, Inc. (Rec. Doc. 49)** filed by plaintiffs Motivatit Seafood, Inc., Ernest A. Voisin, Jason Voisin, Naomi Voisin, Michael Voisin, Jarred Voisin, Greg Voisin, and Sarah T. Voisin (collectively "Motivatit"); and a **Motion for Summary Judgment on the Claims of the Motivatit Claimants (Rec. Doc. 50)** filed by the United States of America.  Both motions are opposed.

Motivatit filed this suit under the Administrative Procedure Act seeking review of a decision by the National Pollution Funds Center ("NPFC") under the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C.A. § 2701, et seq.  Motivatit challenges the denial of its claim for damages sought as a result of an oil spill in Terrebonne Bay on January 30, 2003.  Motivatit is the owner of oyster beds in Terrebonne Bay.  Motivatit contends that the NPFC's denial of its claims was arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with law.

1

Motivatit now moves the Court to render a judgment in its favor reversing the adverse administrative decision and remanding the claims for further consideration of damages. The United States likewise moves for a judgment in its favor upholding the NPFC's administrative decision.  For the reasons that follow, Motivatit's motion is DENIED and the United States's motion is GRANTED.

**I.   BACKGROUND**

On January 30, 2003, a vessel traveling southbound in the Houma Navigational Ship Channel noticed an oil sheen in Terrebonne Bay and contacted Chevron's local office.  Between the hours of 9:00 and 10:00 a.m., Chevron's representative contacted the Louisiana State Police, the Coast Guard, the Louisiana Department of Environmental Quality, the Terrebonne Sheriff's Office, and the National Response Center.  (Joint Stip. Fact # 1).  The source of the release was later identified as a 10-inch diameter pipeline located at 29 11' 57.5" N and longitude 90 36' 6.6 W, which was owned and operated by Shell Pipeline Co.  (Joint Stip. Fact # 2).  The pipeline lies in Terrebonne Bay, which is contiguous to the Gulf of Mexico and part of the navigable waters of the United States, which are subject to the OPA.  (Joint Stip. Fact # 3).  Shell was informed of its pipeline leak at about 9:45 a.m. CST on January 30, 2003.  Shell ordered the pipeline shutdown at 9:50 a.m.  The pipeline was reported permanently

secured by a clamp with no leaking at 7:10 p.m. on the evening of January 30th. (Joint Stip. Fact # 4).

An overflight was conducted at 1330 hours on the day of the leak. It showed the northern point of the slick at 29° 14' 12.7" N, 90° 35' 36" W. (Joint Stip. Fact # 8). A second overflight was conducted at 1510 hours. This flight indicates a "reduced northern migration" with a northern point of 29° 11'N, 90° 42' W and the southern point at 29° 04'N, 90° 42 W. (Joint Stip. Fact # 10). The sheen was reported to be 10 miles long and ½ mile wide at its widest point. By the end of the first day, 17.5 barrels of crude oil were recovered. (Joint Stip. Fact # 11). That evening cleanup operations were suspended due to weather conditions. (Joint Stip. Fact # 12).

Cleanup operations resumed and an overflight was conducted at midday on January 31, 2003. During that overflight, Vincent Cheramie with the Louisiana Department of Environmental Quality ("LDEQ") reported that East Island and Trinity Island had been impacted and oil covered most of Lake Pelto, and bands were present at the area of convergence. Bands of oil had gone through the passes of the Isle Dernier chain into the Gulf of Mexico for a few miles. Very large areas of sheen were present offshore, along with streams and bands of oil at the leading edges outside these passes (Wine Island Pass, Coupe Juan, and Whiskey Island Pass). (Joint Stip. Fact # 13).

Another overflight was conducted that afternoon with essentially the same conditions reported.  However, Cheramie reported that close to a hundred square miles of surface had been impacted by the oil.  Later that day, hard and soft boom had been deployed at the islands and oiled birds began to be discovered. (Joint Stip. Fact # 14).

The National Oceanic and Aeronautic Administration ("NOAA") issued a hotline bulletin at 1030 EST on January 31, 2003, assessing the potential risk to natural resources posed by the spill.  The bulletin noted the importance of the entire area for oyster lease beds, and that oysters would be particularly susceptible to the spill given that they live in shallow water and are filter feeders; mortality may not result, but tainting may be of concern.  (Joint Stip. Fact # 15).

Over the next several days overflights were conducted and clean-up operations continued.  Oil generally flowed southerly through the barrier island passes into the Gulf of Mexico.  As the oil migrated through the island passes on an outgoing tide, the converging currents created streamers that extended into the Gulf of Mexico.  Trinity Island, East Island, and Freeport Island had been impacted by the spill.  The heaviest of these impacts was on Freeport Island.  (Joint Stip. Fact # 16).

On February 2, 2003, Shell pressured its line back up at around 2:00 p.m.  Upon pressuring up, another leak occurred

4

closer to Shell's platform near Wine Island.  A band of oil from the new release was reportedly streaming to the northeast.  Shell reported the release as a 5 gallon crude oil spill but Shell nonetheless pulled skimming vessels off of the main spill in order to address this new spill.  (Joint Stip. Fact # 17).

Shoreline Cleanup Assessment Teams ("SCAT") were deployed on February 4, to assess the cleanup of the shoreline.  Shoreline impacts observed from previous overflights and SCAT observations included Whiskey Island, Freeport Sulphur Island, Trinity Island, East Island, and marsh fringes in the Lake Barre area.  Freeport Sulphur Island was the most significantly impacted and was where the most active cleanup was conducted.  The marsh that was impacted in North Lake Pelto and the Eastern edge of Lake Barre was not as heavy and consisted mostly of impact to the fringes of the marsh.  The trade-off for recovering this product did not warrant heavy active clean up in these areas in light of the potential for unnecessary and permanent damage to the vegetation. (Joint Stip. Fact # 19).

As of February 11th, an inspection of Isle Dernier did not show standing oil on the beach.  However, small tar balls ranging from 5mm-10mm were observed.  The occurrence of tar balls did not require removal.  Freeport Sulphur Island showed that a substantial amount of oil was still present as of that date. (Joint Stip. Fact # 20).

By February 25th, the Unified Command decided that clean up had reached a point where activities could cease.  Shell reported that 160 BBL of crude oil had been released and that 55 BBL was ultimately recovered during the effort.  The Coast Guard accepted Shell's estimate that 160 BBL were spilled.  The Coast Guard estimated, in the last pollution report ("POLREP") that it issued for this spill, that 40-45 BBL of oil had been recovered by February 3, 2003.  Vincent Cheramie of LDEQ surmised that the quantity spilled was likely greater--an Adios model indicated that 30 to 40% of the oil would either evaporate or dissolve within the first hour--with much of the oil drifting offshore. (Joint Stip. Fact # 7, 21).

Shell sought exoneration from OPA's strict liability on the basis that the spill was solely caused by a third party phantom vessel striking the pipeline.  The NPFC administratively determined that the spill was solely caused by the negligence of this third party and therefore that Shell was entitled to OPA's complete defense.  The NPFC reimbursed Shell for eligible clean up costs with funds from the Oil Spill Liability Trust Fund. (Joint Stip. Fact # 22-24).

Plaintiffs, including Motivatit, originally filed suit against Shell for damages resulting from the pipeline leak in Terry Nettleton, Sr., et al. v. Shell Pipeline Co., LP, Civil Actions 04-208, 04-275, 04-548, 05-270.  The Court instructed

Motivatit, among the other plaintiffs, to pursue its claims through the OPA administrative scheme. The cases against Shell were administratively stayed on September 29, 2004, so that Plaintiffs could file their claims with the NPFC. Motivatit filed its initial claim with the NPFC in October of 2005. (Joint Stip. Fact # 26).

The State of Louisiana gives leaseholders the right to cultivate oysters for personal and commercial use in exchange for an annual fee of $2 per acre. (Joint Stip. Fact # 27). In its written claim, Motivatit alleged that it leased 2,887 acres of bottom lands in Terrebonne Bay. (Joint Stip. Fact # 26). Motivatit sought $7,533,070.00 in damages as a result of the January 30, 2003, oil spill. Motivatit claimed damages for loss of subsistence use of the oyster leases, loss of natural resources, and destruction of and loss of real property and personal property. (Joint Stip. Fact # 28). The NPFC reclassified the loss of natural resources claim as a claim for lost profits and earning capacity because a private party like Motivatit lacks standing to submit a claim for loss of natural resources. (Joint Stip. Fact # 29).

The NPFC denied Motivatit's claim on January 16, 2008. (Joint Stip. Fact # 30). Motivatit submitted a request for reconsideration of the denial of its claim on March 18, 2008. (Joint Stip. Fact # 31). Motivatit's evidence included

affidavits from plaintiffs Mike Voisin and Ernest Voisin, a list
of leases allegedly affected by the leak, seven daily activity
sheets documenting oyster sacks dated between 2003 and 2006, a
damages report by CPA Thomas Lanaux, a schematic map showing the
location of the Motivatit's leases, Motivatit's tax returns for
2000-2006, and a report from Noel V. Brodtmann, Jr. (Joint Stip.
Fact # 32). Brodtmann is a "certified biologist" with the
Louisiana Department of Natural Resources, Oyster Lease Damage
Evaluation Board and he is authorized to perform oyster damage
calculations for the State of Louisiana. (Joint Stip. Fact #
35). The NPFC denied Motivatit's claim upon reconsideration on
December 10, 2008. (Joint Stip. Fact # 33).

## II.   STANDARDS OF REVIEW

### A.   *Judicial Review Under the Administrative Procedure Act*

Both parties agree that the NPFC's decision to deny
Motivatit's damages claim is properly analyzed under the
standards set forth in the Administrative Procedure Act ("APA"),
5 U.S.C.A. § 701, <u>et seq.</u>  The APA prescribes a narrow and highly
deferential standard.  <u>Medina County Envir. Action Ass'n v.
Surface Transp. Bd.</u>, 602 F.3d 687, 699 (5th Cir. 2010). The
Court may not overturn an agency's decisions unless they were
"arbitrary, capricious, an abuse of discretion, or otherwise not
in accordance with law."  5 U.S.C.A. § 706(2)(A) (West 2007).
Under this standard, the Court must assure itself that the agency

considered the relevant factors in making the decision, its actions bear a rational relationship to the statute's purposes, and there is substantial evidence in the record to support it. Medina County, 602 F.3d at 699 (quoting Pub. Citizen, Inc. v. U.S. E.P.A., 343 F.3d 449, 455 (5th Cir. 2003)).  The Court cannot substitute its judgment for that of the agency's.  Id. Where an agency's particular technical expertise is involved, the Court is at its most deferential in reviewing the agency's findings.  Medina County, 602 F.3d at 699 (citing Marsh v. Or. Nat. Res. Council, 490 U.S. 360, 376-77).

When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, the Court might find contrary views more persuasive.  Id.  The Court will uphold an agency's actions if its reasons and policy choices satisfy minimum standards of rationality.  Medina County, 602 F.3d at 699 (quoting Pub. Citizen, 343 F.3d at 455).  Absent evidence to the contrary, the Court presumes that an agency has acted in accordance with its regulations.  Id. (quoting Sierra Club v. U.S. Army Corps of Eng'rs, 298 F.3d 1209, 1223 (11th Cir. 2002)). The petitioner has the burden of proving that the agency's determination was arbitrary and capricious.  Id. (citing Hartford Cas. Ins. Co. v. F.D.I.C., 21 F.3d 696, 704 (5th Cir. 1994)).

**B.   *Summary Judgment Regarding Agency Decisions***

In the usual case, summary judgment is proper when the record, viewed in the light most favorable to the non-moving party, establishes that no genuine issue as to any material fact exists, and the moving party is entitled to judgment as a matter of law.  Tex. Comm. on Nat. Res. v. Van Winkle, 197 F. Supp. 2d 586, 595 (N.D. Tex. 2002) (citing Fed. R. Civ. Pro. 56(c)).  However, where the Court is reviewing the decision of an administrative agency, a motion for summary judgment "stands in a somewhat unusual light, in that the administrative record provides the complete factual predicate for the Court's review."  Id. (quoting Piedmont Env. Council v. U.S. Dep't Transp., 159 F. Supp. 2d 260, 268 (W.D. Va. 2001)).  As a result, the movant's burden in prevailing on summary judgment is similar to his ultimate burden on the merits.  Id.  Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based on the administrative record even though the Court does not apply the standard of review set forth in Rule 56.  Id. (quoting Fund for Animals v. Babbitt, 903 F. Supp. 96, 105 (D.D.C. 1995)). When reviewing administrative agency decisions, the function of the district court is to determine whether as a matter of law, evidence in the administrative record permitted the agency to make the decision it did, and summary judgment is an appropriate mechanism for deciding the legal question of whether an agency

could reasonably have found the facts as it did.  <u>Tex. Comm. on
Nat. Res.</u>, 197 F. Supp. 2d at 595 (<u>quoting</u> <u>The Sierra Club v.
Dombeck</u>, 161 F. Supp. 2d 1052, 1064 (D. Ariz. 2001)).

**III.  <u>DISCUSSION</u>**

  **A.  *Motivatit's Claim and The NPFC's Decision***

     Motivatit filed its formal claim with the NPFC seeking a
total of $7,533,070.00 in damages sustained to 2887 acres of
oyster leases over a five year period.[1]  (TM00003-TM00018).
Motivatit broke its damages claim down as $28,870.00 for loss of
subsistence use; $1,730,200.00 for loss of natural resources;[2]
$5,774,000.00 for destruction of real and personal property.[3]
(TM00006-TM00006). Motivatit asserted that these leases were
damaged due to the pollution caused by the Shell oil leak--that
in 2002 the leases had produced 20,000 sacks of oysters at $18
per sack, but that no production occurred in the years 2003 and

---

     [1] The leases returned to full production as of 2007 so the
projected losses were reduced from a 5 year period to a 3 year
period.  (TM00021, Ernest A. Voisin affid. ¶ 11).

     [2] The NPFC reclassified the $1,730,200.00 loss of natural
resources claim as a lost profits or impairment of earning
capacity claim because private parties cannot recover under OPA
for loss of natural resources.  <u>See</u> 33 U.S.C.A. § 2702(b)(2)(A)
(West 2001 & Supp. 2011).

     [3] In arriving at its numbers Motivatit assumed that 100
percent of its leases were affected by the spill and that each
lease sustained a 100 percent loss in oyster production for years
1 through 3.  (TM00012).  Motivatit assumed a 60 percent loss in
production for year four and a 40 percent loss in production for
year five.  (<u>Id.</u>).

2004 because of the pollution.  (TM00004).  Motivatit advised
that it would generally take 3 to 5 years to allow the oysters to
recover in order for them to become marketable.  (Id.).
Motivatit also explained that it had planted an additional 14,914
sacks of seed oysters during 2002 but that this harvest was never
realized.  Motivatit estimated that these planted oysters would
have resulted in additional production of 15,000 sacks per year
for an additional loss of $300,000 over 2003-2004.  (Id.).
Motivatit stated that it was currently purchasing on the market
15 to 34 thousand sacks of oysters per year at between $19 to $23
per sack to supplement the loss of production from its current
leases, with additional freight charges of $2.25 to $2.50 per
sack.  (Id.).  Motivatit's theory was that the oil spread into
the waters where its oyster leases were located and then the
prevailing winds and tides caused the oil to sink to the water
bottom and contaminate Motivatit's oysters.  (TM00007).

     The NPFC denied Motivatit's claim as originally filed and
issued a 9 page opinion explaining its reasons.  (TM00033-
TM00041).  The crux of the denial was that Motivatit had failed
to provide sufficient proof of economic losses or to provide
sufficient evidence that its property sustained damage.
Motivatit moved for reconsideration and submitted 11 new pieces
of documentation in support of its claim.  (TM00120-TM00121).

     The NPFC denied Motivatit's claim on reconsideration.  The

NPFC concluded that Motivatit had not proven its entitlement to compensation based on loss of subsistence.  According to the NPFC, Motivatit had not shown that it used the oysters as a natural resource for subsistence or that it relied upon the oysters as a natural resource.  (TM00123).  The NPFC also explained that the submission failed to provide evidence that the Shell pipeline oil spill incident contaminated, and thus injured, damaged, or destroyed, Motivatit's oysters.  (Id.).

The NPFC also concluded that Motivatit had failed to prove its lost profits/earning capacity claim. The NPFC noted that for a harvestable product like oysters, a claimant must show that a harvest was lost or impaired and that the loss was caused by the oil spill incident.  (TM00123).  The NPFC concluded that Motivatit's assumption of 100 percent damage for the first three years, and 60 and 40 percent damage for years four and five, respectively, was not supported by any financial information in the record.  (Id.).  The NPFC noted that Motivatit's data showed an increase in outside oyster purchases for 2003 and 2004 but that the evidence did not link these increased purchases to any loss of profit or impairment of earning capacity resulting from the oil spill.  The NPFC rejected Motivatit's accountant's loss projections as evidence of loss of oyster production.  (TM00124). Moreover, the NPFC found that Motivatit's financial data failed to demonstrate that Motivatit had actually suffered any type of

economic damages in the aftermath of the oil spill.  Instead,
Motivatit's tax records indicated that it had earned more income
each year following the oil spill incident.  In 2003, Motivatit
had increased its income by 11.56 percent over 2002, and by 21.19
percent in 2004 over 2003.  (TM00124).

Finally, the NPFC concluded that Motivatit had failed to
prove its claim for real and personal property damage.  The NPFC
noted a lack of evidence to demonstrate that oil contaminated or
destroyed Motivatit's oysters or oyster beds.  (TM00125).

The NPFC summed up the denial as a failure of evidentiary
support for Motivatit's claim.  (TM00125).  The NPFC was
persuaded that Motivatit had simply failed to prove that any of
its claimed damages were a direct result of the Shell pipeline
oil spill incident.  (TM00126).  Thus, all claims were denied on
reconsideration.

### B.   *Motivatit's Challenge to the NPFC's Decision*

Motivatit posits several arguments in support of its
contention that the NPFC acted arbitrarily and capriciously in
denying its claims.  First, Motivatit contends that the NPFC held
Motivatit to a higher burden of proof than what either the OPA or
the agency's regulations require.  Second, Motivatit contends
that the NPFC made credibility judgments by choosing to rely on
certain pieces of evidence while rejecting others that did not
comport with its decision.  Finally, Motivatit points to various

"other errors" that constitute a "back end effort" by the NPFC to deny Motivatit's claim.   The Court considers each of these arguments in turn.[4]

### 1.   Higher Burden of Proof

Motivatit argues that the NPFC has no real standards governing the burden of proof for a damage claim pertaining to oyster leases.   Motivatit points out that the NPFC repeatedly stated in its written decision that Motivatit did not carry its burden of proof yet the decision makes clear that the NPFC has adopted a standard that is inconsistent with administrative claims and which no party could ever satisfy much less determine the applicable standard.

Congress enacted the OPA in the wake of the EXXON VALDEZ oil spill in 1989.   In re Oil Spill by the Oil Rig DEEPWATER HORIZON, No. MDL 2179, 2011 WL 3805746, at *11 (E.D. La. Aug. 26, 2011) (Barbier, J.).   OPA is a comprehensive statute addressing responsibility for oil spills, including the cost of clean up, liability for civil penalties, as well as economic damages incurred by private parties and public entities.   Id.   OPA

---

[4] Motivatit suggests that the NPFC's opinion is so fraught with inconsistencies that it would likely be impracticable to address all of the errors within the page limitations imposed by this Court.   Therefore, the specific errors cited and briefed are examples of the most egregious errors.   (Pla. Memo in Supp., Rec. Doc. 49-2, at 14).   Motivatit has the burden to direct the Court's attention to the specific errors that render the agency's decision invalid.   Therefore, the Court only addresses those challenges specifically raised by Motivatit.

imposes liability on a responsible party for a facility from which oil is discharged into the navigable waters of the United States for damages "that result from such incident."  33 U.S.C.A. § 2702(a) ("Elements of Liability").  But OPA also allows a responsible party to limit or receive exoneration from liability if it can establish that the damage results solely from the act or omission of a third party.  Id. § 2703(a)(3).  Claimants can then seek compensation from the Oil Spill Liability Trust Fund. 33 U.S.C.A. § 2712 (West 2001 & Supp. 2011);26 U.S.C.A. § 9509 (West 2011).  The NPFC is an agency of the United States Coast Guard and it administers the Fund.  Smith Prop. Holdings v. U.S., 311 F. Supp. 2d 69, 71 (D.D.C. 2004).  Categories of damages available under OPA include real or personal property, subsistence use, and profits and earning capacity.  33 U.S.C. § 2702(b)(2)(B), (C), (E).

Implicit in the OPA statutory scheme is the principle that the NPFC has no interest in compensating claimants for harm caused by something other than a specific, identifiable oil discharge incident.  In this case, in order to obtain payment from the Fund, Motivatit had to establish injury causally related to the Shell oil leak of January 30, 2003, which was the specific discharge incident at issue in this case.  Regardless of the phraseology or label used to describe the claimant's burden of

16

proof, it is a simple question of causation.[5]  Thus, the crux of
Motivatit's argument is really that in light of the evidence that
it submitted in support of its claim, the NPFC could not have
validly denied Motivatit's claims unless it relied upon an
unauthorized standard that was more onerous than a preponderance
of the evidence.

     Of the numerous documents that Motivatit submitted in
support of its claim, the causation analysis, i.e., whether
Motivatit's leases were physically damaged by the Shell leak,
really came down to a battle of the biology experts:  Noel
Brodtmann versus Ronald Kilgen, both of whom are well-qualified
experts.  Attorneys for various claimants, including Motivatit,
retained Brodtmann's firm, EPL, Inc., to collect water bottom
sediment samples from marshes in Terrebonne Bay.  (TM00356).
Brodtmann's preliminary investigative report states that in 2005
"[m]easurable to highly significant levels" of hydrocarbons were
reported in 10 of the 14 samples submitted for analysis.
(TM00358).  Brodtmann's conclusion was that oil from the pipeline
rupture spread over a very large area via wind, waves, and tidal
currents and that oil persists in the water bottom sediments.
(TM00364).  Brodtmann concluded that as "a logical next step,
"several separate oyster tissue samples will be collected in

_____

     [5] Both parties agree that the appropriate burden of proof
for an OPA claimant is preponderance of the evidence.

those areas where oil hydrocarbons were found in sediment samples.  Analysis of oyster tissues will allow us to determine if live oysters in the area continue to have petroleum hydrocarbons in their tissues so as to preclude human consumption."  (TM00364).

The claimants did not perform the follow-up testing that Brodtmann referred to in his preliminary report.  But Brodtmann did prepare two follow-up reports.  The first of the follow-up reports discusses research pertaining to the harm sustained by oysters when exposed to oil, without specific reference to this incident or Motivatit's leases.  (TM00102-TM00107).  The final submission takes issue with Kilgen's report.  (TM00090-TM00100).

Shell's attorneys hired Ronald H. Kilgen's firm, Kilgen Environmental Services, to specifically investigate Motivatit's claim for damage to its oyster leases.  (TM02847).  Kilgen conducted field investigations during June and July 2003--about 4 ½ months after the leak--with respect to each of Motivatit's leases.  Kilgen noted that at the time of the pipeline leak, the State had closed about 90 percent of the leased acreage for harvesting due to fecal coliform pollutants, and that during March and April 2003 about 87 percent was closed.  (TM02852).

Kilgen reported that as of June 2003, no noticeable signs of oil were present in the oysters tested.  (TM02897).  Kilgen believed that as of the date of testing, most of the oily

pollutants had diminished to the point where they were not
significant and most of the oysters had been depurated, and thus
marketable.  Because spat-sized oysters were found in many
samples, Kilgen suggested that oyster reproduction and
recruitment had not been measurably impacted.  (TM02897).  Kilgen
acknowledged that oil probably contaminated the oysters on some
of Motivatit's leases and that the corresponding time frame that
the oysters would be unmarketable would probably range from one
to four months, assuming of course that the lease was not already
subject to closure due to fecal coliform pollutants.  But Kilgen
concluded that beyond this short time frame, there was likely no
widespread, significant long-term adverse impact to the oyster
leases resulting from the Shell incident.  (TM02897).

     In its decision denying Motivatit's claims, the NPFC
summarized Kilgen's conclusions.  (TM00114).  But more
importantly, the NPFC explained why Brodtmann's conclusions and
findings did not support Motivatit's contention that its leases
sustained damages.  The NPFC recognized that Brodtmann's samples
established measurable degrees of oil contamination at various
points in the Terrebonne Bay area.  (TM00121).  But the NPFC
noted that nothing in Brodtmann's report linked the contamination
to the January 30, 2003, Shell leak, and that without more
information or analysis such a connection could not be made.
(TM00122).  Further, while Brodtmann's sample results confirmed

the presence of oil contamination in Terrebonne Bay at the
designated locations and dates, none of the samples were
probative of oil contamination from the Shell leak vis à vis
Motivatit's leases.  (TM00122).  And even where samples had been
taken, there was no evidence of damaged oysters.  (<u>Id.</u>).  The
NPFC did not take issue with any of Brodtmann's findings but
rather found that Brodtmann's findings were insufficient to prove
the damages claimed by Motivatit.  (TM00122).

     The NPFC interpreted OPA as requiring Motivatit to submit
evidence that oil from "this incident" contaminated its oyster
beds, or otherwise prevented Motivatit from harvesting its
oysters for a specified period of time.  As part of that burden,
the NPFC thought it necessary for Motivatit to prove that its
oyster leases were not subject to closure due to fecal coliform
pollution during the period for which it was claiming damages.
(TM00115).

     The Court is not persuaded that the denial results from the
NPFC imposing a higher or a more onerous burden of proof than by
a preponderance of the evidence.  First and foremost a claimant
must prove injury, and the OPA requires that the proven injury be
directly traceable to the specific oil release incident at issue.
Brodtmann's reports do not establish these requirements by a
preponderance of the evidence and the United States succinctly
identifies the problems with Brodtmann's reports in its

20

memorandum in support of its motion for summary judgment.  (Rec. Doc. 50-3, at 10-12).  The reports simply do not establish harm to Motivatit's own leases resulting from the Shell oil leak.[6]

The Court recognizes that Brodtmann's reports were not the only evidence that Motivatit submitted to the NPFC.  But evidence such as the plaintiffs' affidavits and the accountant's report do not provide proof of damage to Motivatit's oyster leases.  The decision does not suggest that the NPFC was convinced that oil is harmless to oysters.  But Motivatit claimed damage to 100 percent of its leases in total for at least 3 years.  Meanwhile, while some of the oil did drift in a northerly direction, the record suggests that the northerly progress was minimal at best.  The flow of the oil leak was generally southward toward the Gulf of Mexico and Motivatit's leases are all located to the north of the leak site--anywhere from 2-13 miles north.  Further, there is no evidence that the oil from this incident became submerged.[7] Contrary to Motivatit's suggestion, this Court cannot simply take

---

[6] Neither party alludes to any evidence to suggest one way or the other if there had ever been other documented oil spills in the area.  If there were, then that begs the question as to how long soil sediment contains evidence of hydrocarbons.

[7] Brodtmann states in his Summary and Conclusions that winds, waves, and tidal currents spread oil from the Shell leak over a large area of water bottoms.  (TM00364).  Brodtmann does not explain this statement so the Court assumes that he reached this conclusion because he found measurable hydrocarbons in some of his Terrebonne Bay sediment samples.  It is not clear whether an expert oyster biologist is also qualified to opine as to the effect of the elements on oil migration.

notice of the recent events involving the BP oil spill to conclude that the NPFC acted arbitrarily and capriciously in refusing to assume that enough oil from the Shell leak drifted northerly and became submerged in sufficient quantities so as to harm Motivatit's oyster leases.[8] (Pla. Memo. in Supp., Rec. Doc. 49-2, at 5 n.9).  Motivatit points out that no government agency sought to determine the subsurface impact of the oil spill.  (Id. at nn. 9, 11).  But the NPFC does not bear the burden of disproving harm to Motivatit's oyster leases.

In sum, Motivatit has not shown that the NPFC's decision was based on an inappropriate standard of proof that was not in accordance with law.

### 2.   *Credibility Judgments*

Motivatit's arguments in the vein of "credibility judgments" pertain in large part to the NPFC's decision to rely on the opinions of Shell's expert Ronald H. Kilgen when denying the claim, while at the same time rejecting Motivatit's expert Noel Brodtmann's opinion as a basis for concluding that Motivatit's oysters were damaged by the oil spill.  Motivatit contends that the NPFC impermissibly made a credibility call on documents that compete with each other.  In a broader sense, Motivatit argues

---

[8] Of course the BP oil spill spanned several months and might have been the worst oil spill in history thus far.  The fact that oil might have become submerged in that situation is not probative of what happened to Motivatit's leases.

that the NPFC simply "cherry picked" what it wanted from the evidence in order to deny the claim all the while ignoring Motivatit's evidence.

This argument lacks merit for several reasons.  First, the Fifth Circuit has specifically recognized that an agency has discretion to credit one expert's report over another when experts express conflicting views.  See Medina County, 602 F.3d at 699.  In this case, the NPFC clearly explained why it found Brodtmann's report to be unpersuasive with respect to Motivatit's claims.  Thus, this case does not present a situation where an agency arbitrarily rejected a claimant's expert without justification.  Finally, Brodtmann's findings were not specific to Motivatit's leases whereas Kilgen's findings were specific to this claim.

Motivatit also points to the fact that even Kilgen noted that at least some of the leases were probably contaminated from somewhere between 1 to 4 months.  (TM02897, USA Exh. E at 51).  But even assuming that this is true and that the leases were temporarily affected, there is no indication that those affected leases could have been harvested anyway during the 1 to 4 month window given the significant number of Motivatit's leases that were already under State closure due to the fecal coliform problem.  Moreover, as discussed in greater detail below in conjunction with the United States's motion, Motivatit's income

statements do not reflect a loss of profits during this time
period.

In sum, the NPFC did not act arbitrarily and capriciously by
crediting Kilgen's findings and declining to extrapolate
Brodtmann's findings to Motivatit's oyster leases.

### 3. "Other Errors"

Motivatit contends that the NPFC ignored the NOAA hotline
notice regarding oysters and also ignored Cheramie's similar
comments about oysters.  The NOAA posted a bulletin on its
website on January 31, 2003, at 9:51 a.m.  The bulletin provides
information about the Shell leak and states that "[t]he entire
area is important for oyster lease beds," and that "[o]ysters are
particularly susceptible to this spill, since they live in
shallow water and are filter feeders.  Mortality may not result,
but tainting may be of concern."  (TM02750, Pla. Exh. 10).
Vincent Cheramie's report of July 14, 2003, suggests that the
quantity spilled was greater than the 55 BBL reported by Shell.
(TM00064).

Neither of these documents establish harm to Motivatit's
oyster leases.  Motivatit's claims are based in part on the
contention that the magnitude of the leak alone should have been
sufficient to convince the NPFC that Motivatit's leases were
damaged.  (Pla. Reply, Rec. Doc. 55, at 6).  But the Court has
seen no evidence to suggest that this is true, much less that the

24

NPFC acted arbitrarily and capriciously by declining to make this assumption.

Motivatit argues that NPFC substituted its judgment for that of Motivatit's accounting expert Thomas J. Lanaux.  Motivatit argues that the NPFC rejected the opinions of a licensed CPA and came up with its own method for calculating damages.  (Pla. Reply, Rec. Doc. 55, at 7).

Lanaux is not an expert on oil migration or oyster biology--he is a licensed CPA.  As such, his calculations are based on the assumptions given to him.  In this case, the NPFC concluded that the evidence submitted did not support the assumptions upon which Lanaux's calculations were based.  The NPFC did not usurp the role of a licensed CPA.  This argument lacks merit.

Motivatit contends that the NPFC made a de facto adoption of the standards observed by the Louisiana Department of Natural Resources' Oyster Lease Damage Evaluation Board ("LaOLDEB") and improperly used this as if it were a validly adopted federal regulation.  The original denial issued by the NPFC made a reference to the LaOLDEB standards when discussing the experts' reports.  (TM00038, Pla. Exh. 2).  It is unclear what part, if any, the LaOLDEB standards played in the final decision issued by NPFC, which is now before the Court.  As explained above and for reasons wholly exclusive of the LaOLDEB standards, the NPFC did not act arbitrarily and capriciously when concluding that

Brodtmann's report did not support Motivatit's allegations of damage.  Thus, this argument lacks merit.

Motivatit argues that the NPFC acted inconsistently in absolving Shell from liability while denying Motivatit's claim. The NPFC's decision to exonerate Shell for damages from the leak is not before the Court at this time.  Moreover, the NPFC's treatment of Shell's claim has nothing to do with whether Motivatit proved its claim.  This argument lacks merit.

For the foregoing reasons, Motivatit has not shown that the NPFC's decision to deny its claim was arbitrary, capricious, or otherwise not in accordance with law.  Motivatit's motion is therefore DENIED.

### C.   *The United States's Motion for Summary Judgment*

Most of the United States's arguments are implicitly addressed in the Court's treatment of Motivatit's specific challenges to the NPFC's decision.  But one particularly significant argument by the United States, and one which Motivatit never directly addresses in its memoranda, is the point that Motivatit's own tax records do not show a loss of revenue or profits for the years in question.  In fact, Motivatit's income increased significantly for every year at issue following the oil spill.  A claim for loss of profits or earning capacity, which comprises the largest part of Motivatit's claim, requires proof that the claimant's income was *reduced* as a consequence of the

spill.  33 C.F.R. § 136.233(b).  Motivatit attempted to explain to the NPFC that its documentation would not necessarily show a "loss of profits" because Motivatit purchased additional oysters from Texas and had those trucked in and sold.  (TM00085).  Based on the tax returns, this action must have significantly mitigated and even overcame any potential losses.  Of course, during the time immediately following the oil spill, Motivatit likely already had in place arrangements to profitably bolster its oyster production given that the majority of its leases were already closed due to the fecal coliform problem.  The United States points out in its briefing that the Fund does not reimburse for *hypothetical* loss of profits, (USA Memo. in Supp., Rec. Doc. 50-3, at 19), and the Court agrees.  The regulations make repeated references to efforts to mitigate losses so it is clear that any type of windfall recovery is not allowed.  See, e.g., 33 C.F.R. § 136.233(d); 33 C.F.R. § 136.235(b), (d).

The United States's motion is GRANTED.

**IV.  CONCLUSION**

Motivatit's claims come before the Court under a deferential review standard governed by the APA.  The Court is persuaded that the NPFC considered the relevant factors when denying Motivatit's claims and that the NPFC's actions bear a rational relationship to the OPA's purposes.  The agency could have reasonably reached the decision that it did in light of the evidence in the record.

There is no evidence that the NPFC acted contrary to its regulations.  Motivatit has not established that the NPFC's denial of its claims was arbitrary, capricious, or an abuse of discretion, or otherwise not in accordance with law.  The United States is entitled to judgment as a matter of law.

Accordingly, and for the foregoing reasons;

**IT IS ORDERED** that the **Cross-Motion for Summary Judgment by Motivatit Seafood, Inc. (Rec. Doc. 49)** filed by plaintiffs Motivatit Seafood, Inc., Ernest A. Voisin, Jason Voisin, Naomi Voisin, Michael Voisin, Jarred Voisin, Greg Voisin, and Sarah T. Voisin is **DENIED**;

**IT IS FURTHER ORDERED** that the **Motion for Summary Judgment on the Claims of the Motivatit Claimants (Rec. Doc. 50)** filed by the United States of America is **GRANTED**.

October 31, 2011

JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE

28